FILED
2022 Apr-29  PM 04:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SNIDER TIRE, INC., d/b/a/ SNIDER FLEET SOLUTIONS, <br><br> Plaintiff, <br><br> v. <br><br> TIMOTHY CHAPMAN, and SOUTHERN TIRE MART, L.L.C., <br><br> Defendants. | Case No.: 2:20-cv-01775-AMM |

## OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Snider Tire, Inc., doing business as Snider Fleet Solutions, opposes Defendants Southern Tire Mart, L.L.C. ("STM") and Timothy Chapman's motion for summary judgment. (D.E. 50.) based on the evidence submitted herewith and the law set out in the accompanying Memorandum. Defendants have not carried their burden of establishing there are no material facts in dispute and have not shown they are entitled to judgment as a matter of law.

Nevertheless, Plaintiff will voluntarily dismiss its claim for Breach of Fiduciary Duty related to Defendants' recruiting Snider employees not because of lack of evidence, but because it has not been able to identify sufficient damages stemming from that conduct to justify the costs of litigating the claim.

i

Snider does not request oral argument and notes Defendants do not do so either in their motion. (*See* D.E. 14 at 8.)

/s/ *Edward F. Harold*
Edward F. Harold
AL Bar No. asb-0669-d55h
FISHER & PHILLIPS, LLP
201 St. Charles Avenue, Suite 3710
New Orleans, LA 70170
Telephone: 504-522-3303
Facsimile: 504-529-3850
*Attorney for Plaintiff*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................ 1

STATEMENT OF FACTS ............................................................... 2

I.   Additional Undisputed Facts that Require Denial
     Of Summary Judgment ......................................................... 2

     A.   Chapman's Employment with Snider ........................... 2

     B.   Chapman Leaves Snider and Joins STM, Taking Snider's
          Confidential Information with Him ............................. 4

     C.   Snider's Use of the TireCheck System ....................... 8

II.  Snider's Disputes with Defendants' Claimed Undisputed Facts ........ 10

ARGUMENT ................................................................................. 13

I.   Whether Snider Properly Invoked the Non-Competition
     Agreement Is a Question for Trial ....................................... 13

     A.   The Seven-Day Delay in Payment of Severance Did Not
          Invalidate the Agreement for Want of Consideration ........ 14

     B.   The Payment of Severance is Not a Condition Precedent
          To the Enforcement of the Restrictive Covenants ........... 16

     C.   Whether Snider's Seven-Day Delay in Initiating Severance
          Payments Is a Material Breach of the Contract is a Dispute
          For Trial ........................................................... 18

     D.   The Undisputed Evidence Establishes Snider Timely Invoked
          The Restrictive Covenants ...................................... 20

     E.   The Court Has Already Considered and Rejected
          Defendants' Argument Regarding a Lack of Chapman's
          Assent to Paragraph 6 ........................................... 23

II.   Defendants Are Not Entitled to Summary Judgment on Snider's
      Claims for Misappropriation of Trade Secrets ..................................... 23

      A.   The Information Chapman Took is a Trade Secret Under
           Alabama Law and Federal Law .................................................. 24

           1.   TireCheck data is used in a trade or business..................... 24

           2.   TireCheck data is "included or embodied" in a
                "compilation" of data........................................................... 25

           3.   Snider's data in TireCheck is not publicly known and
                Is not generally known in the trade...................................... 26

           4.   The data in Snider's TireCheck system cannot be
                Readily derived from publicly available information......... 28

           5.   Snider made reasonable efforts to maintain the secrecy
                Of its customer data in the TireCheck system.................... 29

           6.   Snider derives significant economic value from the
                Data in the TireCheck system............................................. 30

           7.   The evidence establishing the TireCheck data was a trade
                Secret under Alabama law also establishes it was a trade
                Secret under federal law ..................................................... 31

      B.   The Evidence Supports a Reasonable Inference that Chapman
           Used the Information He Took from Snider for STM................ 32

III   The Evidence Establishes an Issue of Fact over Chapman's Breach
      Of the Employment Agreement's Confidentiality Provision ............. 33

CONCLUSION ................................................................................. 35

FP 43852210.2

## INTRODUCTION

Defendant Timothy Chapman acknowledges that if properly invoked by Snider, he was subject to a binding non-competition agreement valid on its face under both North Carolina and Alabama law. He admits it prohibited him from working for Defendant STM in Birmingham when he resigned from Snider. He admits that he took employment with STM in Birmingham in violation of his contract. He admits that after he resigned, and after he began employment with STM, he obtained another person's password for Snider's TireCheck computer system, logged into it, and received reports about Snider's customers from that system at his personal email account. He admits that he provided STM with information about his Snider customers that he would not have given to a competitor. And he admits that he directly solicited business from his Snider customers on behalf of STM. While Chapman denies he used Snider's information in his solicitation efforts, given the lengths he took to obtain the information, and the volume of information taken, an inference can be drawn that he did. Not surprisingly, Chapman was successful in convincing two customers to take their business from Snider to STM, costing Snider over the period of the non-competition agreement some $250,000 in sales.

Because of these admissions, Defendants' motion for summary judgment has two primary contentions: that Snider did not properly invoke the non-competition

agreement and that the information Chapman took was not a trade secret or confidential. Snider's evidence demonstrates that it took the prescribed steps to invoke the restrictive covenant, *i.e.*, mailing notice of its intent to Chapman certified mail, return receipt requested. Snider's evidence also shows that the information Chapman took meets the definition of a trade secret under Alabama and federal law and/or is confidential information Chapman was prohibited from using by his Employment Agreement. Chapman unquestionably violated his employment agreement, and STM and Chapman violated the Alabama Trade Secrets Act and the Defense of Trade Secrets Act in using Snider's trade secrets to solicit Snider's customers.

## STATEMENT OF FACTS

### I.   **Additional Undisputed Facts that Require Denial of Summary Judgment**

#### A.   **Chapman's Employment with Snider**

1.   Snider is in the business of selling and servicing: medium truck tires for commercial vehicles, the manufacture of retreaded commercial truck tires, industrial forklift tires, and the sale of servicing-related products for use in the commercial truck industry. Snider has locations Alabama and nine other states. (D.E. 53-1 at 1.)

2.   Snider employed Defendant Chapman from July 1, 2017, until October 2, 2020. His final position was management-level—Senior Fleet Account Manager—and his duties were primarily sales of Snider products and services. (*Id.* at 2.)

2

3.     The position of Senior Fleet Account Manager comes with access to confidential business information belonging to Snider. This includes information about Snider's customers, like their nonpublic contact information, buying habits, data concerning the current states of the tires on their vehicles, and projections about their tire and other related needs for the future. (*Id.*)

4.     Snider takes several steps to protect its confidential business information from unauthorized access and disclosure. Snider stores such information using software that requires a password to access it. (*Id.* at 10.)

5.     Snider maintains policies that apply to all employees (and are given to them in the company's employee handbook) instructing them to, among other things, store confidential information in locked files, refrain from disclosing confidential information to persons outside the workplace and coworkers with no need to know the information, and return all confidential information when their employment ends. (*Id.* at 10; *see id.* at 45–48.)

6.     Snider provided Chapman with a copy of its employee handbook that contained these policies. (*Id.* at 10; *see id.* at 49–51.)

7.     Snider requires its Senior Fleet Account Managers to execute an agreement with Snider preventing them from disclosing or misusing Snider's confidential information that they use in connection with their job duties. (*Id.* at 2.)

3

8.     On December 6, 2019, when Chapman accepted the promotion to Senior Fleet Account Manager, he and Snider signed an Employment Agreement that included restrictive covenants preventing him from directly competing with Snider, soliciting Snider's employees or customers, and disclosing Snider's confidential information if he left Snider. In return, Snider promised to pay Chapman his regular wages for the period it would enforce these covenants. (*Id.* at 2; D.E. 1-1 at 2.)

**B.     Chapman Leaves Snider and Joins STM, Taking Snider's Confidential Information with Him**

9.     In the two weeks prior to his resignation from Snider, Chapman sent several emails from his Snider email address to a personal email address, attaching documents containing information about Snider's customers. (D.E. 53-1 at 7; *see id.* at 17–40.)

10.    The attachments Chapman forwarded himself included information both from the TireCheck system as well as other reports containing information about Snider's customers. For example, Chapman forwarded himself several Off Tire Tracker Reports, sales reports, his Microsoft Exchange contacts, vendor invoices, pricing information, and instructions for generating the Profit and Loss statement for Snider's Birmingham location. (*Id.* at 7.)

11.    The Off Tire Tracker Reports are a record of a customer's equipment and the work done for the customer including detailed information about the servicing of the tires on the customers fleet of vehicles. This information is compiled by

Snider as it performs services for a customer and is used by Snider to sell the appropriate services to the customers. The information contained therein is not publicly available and is known only to Snider. The documents containing the information are maintained in a password protected computer database and cannot be accessed by anyone without a password for Snider's computer system. (*Id.* at 8.)

12.     None of the information Mr. Chapman forwarded to his personal email is generally available to the public nor is it known by Snider's competitors. Snider considers it confidential information subject to the confidentiality provisions of the Employment Agreement and its confidentiality policies. All the information is maintained on a password protected computer system. Mr. Chapman had access to that information only to use in the performance of his duties for Snider. (*Id.*)

13.     The information Mr. Chapman forwarded himself could be used to compete with Snider in that it would provide an overview of the sales, the products, the services, and the prices of Snider's sales to its customers. It could be used to develop a plan to purchase the inventory needed for Snider's customers removing the advantage over competitors Snider has from maintain information about customer sales and service. (*Id.* at 9.)

14.     On October 6, 2020, Chapman began his employment with Southern Tire Mart. (Chapman Dep. 94:12, *available at* D.E. 50-2 at 26.)

5

15.    The STM location where Chapman works is within sixty-five miles of Snider's Birmingham locations. (D.E. 53-1 at 3.)

16.    On October 6, 2020, Richard Cannon, Snider's Vice President of Human Resources, mailed a letter via U.S. Postal Service certified mail, postage prepaid, with return receipt requested, notifying Chapman that Snider was invoking the Employment Agreement's restrictive covenants for a period of nine months. (D.E. 50-2 at 1; D.E. 17-4.)

17.    On October 20, 2020, Snider's counsel sent Chapman a letter further advising him that Snider was invoking the restrictive covenants contained in the Employment Agreement. (D.E. 50-3 at 1–2.) The letter was also sent to STM. (*Id.* at 3.)

18.    Chapman has admitted that he received the October 20, 2020 letter after he resigned from Snider. (D.E. 50-1 at 4.)

19.    In February 2021, Cannon received the October 7, 2020 letter back from the Postal Service. It was marked: "RETURN TO SENDER," "UNCLAIMED," and "UNABLE TO FORWARD." (D.E. 50-2 at 2; D.E. 28 at 2–3.)

20.    While an employee of STM, on November 18, 2020, Chapman sent text messages to Scott Hager containing names and cell phone numbers of five Snider customers' employees responsible for purchasing decisions about Snider's products and services. Chapman used this information in performing his duties for Snider. (D.E. 53-1 at 7; *id.* at 12–16; Chapman Dep. 115:19, *available at* D.E. 50-2 at 31.)

21.     At the time of these texts, Hager was employed by Contract Sales, L.L.C., an agent of STM that sells STM's products and services. (D.E. 53-1 at 7.)

22.     The identities of these individuals and their cell phone numbers are not generally known to the public. (*Id.*)

23.     When Chapman resigned from Snider, the company terminated his access to its computer systems. (*Id.* at 6.)

24.     On October 8, 2020, after he had resigned from Snider and begun employment with Southern Tire Mart, Mr. Chapman obtained a password for Snider's TireCheck system (described below) from an authorized user of the system, Rusty Smith. Smith is employed by Michelin, the company from which Snider licenses the system. Smith's duties include assisting Snider in using the TireCheck system. (*Id.*)

25.     Chapman then used Smith's username and password to log into the TireCheck system. Chapman generated and received reports at his personal email address containing data concerning Snider customers Saiia and Lehigh. Snider was able to identify that this was Chapman, not the vendor, because the email address the reports went to was Chapman's personal email account. (*Id.*)

26.     During the first nine months of his employment with STM, Chapman solicited Snider customers to cease doing business with Snider and begin doing business with STM. (*Id.* at 3.)

7

27.     Specifically, Chapman solicited Lehigh and Saiia during this time, and possibly Lhoist. (Chapman Dep. 98:07, *available at* D.E. 50-2 at 27.)

### C.     Snider's Use of the TireCheck System

28.     The TireCheck system is a database in which Snider stores information about customers, including information gathered in physical inspections of customer equipment. (D.E. 53-1 at 3.)

29.     TireCheck includes tools that analyze the data Snider inputs into it:

a.  Particularly, TireCheck stores and analyzes the measurements obtained during an inspection of a customer's vehicle fleet by make, model, class or type of vehicle, and fleet number. TireCheck also analyzes the tire data and highlights any tires that have mismatched or low tread depth, or uneven wear.

b.  When the data obtained in the surveys over time is compiled, it provides a strong indicator of tire use and needs at a specific customer location. This data is used to plan on-hand inventory for Snider. On-hand inventory cost is a main component for any business as it represents a cash commitment by the business. Tires cost Snider anywhere between $100.00 to $20,000.00 each. The compiled yearly surveys indicate to Snider which tires to keep in stock and when they may be used. This allows Snider to plan how many dollars of inventory to invest in at a given time.

c.  One single fleet check data point is a snapshot when added to months or years of separate snapshots compiled is the long-term value. The single survey (snapshot) is the short-term value but adding several of them together with historical data provides immense value to Snider.

d.  Snider uses the data from TireCheck to plan service capacity, which equates to business cost. The data indicates the life cycle of a specific tire at a specific site on specific unit. With this information, Snider can calculate how many people, trucks, and supplies the location will need in the support of the customer base.

e. TireCheck is also an important tool that Snider offers its customers. When the monthly reports are tallied the data will provide a dollar amount indicator of how many tires and/or service will be needed for a given time frame. This report may also show where improvement is needed to lower running cost. It allows them to set yearly budgets and analyze their costs. Typically, for Snider's customers, tires are their third largest expense behind labor and fuel.

f. Tire-Check when compiled and analyzed on a multi month basis is far more than just a 30-day flat tire report or information anyone with experience in the Off the Road tire business should know.

(*Id.* at 3–5.)

30.    TireCheck's website states that the "[f]leet data" captured and stored by the TireCheck system "becomes powerful knowledge enabling [service providers] to reduce costs, enhance vehicle and driver safety, and improve tire performance." https://www.tirecheck.online/service-provider-software.php.

31.    The TireCheck system has a licensed agreement for each user with not only an upfront charge but also a monthly charge to Snider. Chapman had a login and password that he had to enter each time he used it. Once he accessed Snider's account on TireCheck, Chapman could see the data collected by Snider pertaining to his geographic locale since it began using the system in 2017. (D.E. 53-1 at 5.)

32.    The reports generated by Chapman from TireCheck reflected an extensive investment of the time and effort of Snider employees. For example, the report related to customer Lehigh/Hanson Leeds Alabama comes from twice monthly physical inspections by Snider employees of the tires at that facility. Each inspection

takes approximately three hours. As such, for one year of information from that report reflects an investment of approximately seventy-two-man hours in gathering and entering the data into the TireCheck system. (*Id.* at 6.)

33.     Many of the tires that Snider sells from its Birmingham location are not readily available to purchase from the manufacturer. Rather, they must be ordered up to a year in advance of anticipated delivery. As a result, knowing the historical data in the TireCheck system regarding its customers and their tires allows Snider to have the right tires on hand at the right times to sell to its customers. (*Id.* at 8.)

34.     The data in TireCheck gives Snider a strong competitive advantage over tire dealers who, if they do not have the needed tires in stock at a particular time, cannot fulfill customers' tire needs in a timely fashion. Being able to replace a tire immediately is important to customers who may have equipment they are unable to use if a tire has been damaged. (*Id.*)

## II.     **Snider's Disputes with Defendants' Claimed Undisputed Facts**

19.     Chapman did receive written notice from Snider about invoking the restrictive covenants in the Agreement. (D.E. 50-4 at 8; D.E. 50-3; *see also* D.E. 50-1 at 4; STM Dep. 77:10, *available at* D.E. 53-3 at 21.)

23.     Partially disputed. "Mr. Cannon's letter was not delivered to Chapman's residence." An inference can be reasonably drawn from the markings on the envelope returned to Snider that the Postal Service attempted delivery of the letter

to Chapman's residence, left a note ("LN") on 10/20/2020, and that Mr. Chapman did not claim the letter after being notified of the attempted delivery. (D.E. 28 at 2.)

30, 31, 32.   Chapman admits that an undetermined number of his contacts in the tire industry stem from his employment with Snider. (D.E. 50-1 at 5.) Snider purchased Chapman's prior employer of 15 years, TCI. (D.E. 50-1 at 1–2.)

33.   The confidentiality policies in Snider's employee handbook and the definition of confidential information in Chapman's Employment Agreement designated certain Snider documents as confidential. (D.E. 53-1 at 10; *see id.* at 45–49; D.E. 1-1 at 2.) Additionally, Snider stored its confidential information in computer systems that required a password to access them. (D.E. 53-1 at 5–6, 8.)

34.   The assertion that Chapman did not take or possess Snider's "trade secret" is a legal conclusion. *See MQS Inspection, Inc. v. Bielecki*, 963 F. Supp. 771, 774 (E.D. Wis. 1995). Courts "will not consider portions of affidavits and declarations containing legal conclusions on summary judgment." *MetLife Life & Annuity Co. of Conn. v. Akpele*, 131 F. Supp. 3d 1322, 1328 (N.D. Ga. 2015). Chapman admits to accessing Snider's TireCheck system after his employment with Snider ended. (D.E. 50-4 at 30.)

42.   Fleet survey reports from TireCheck contain significantly more valuable information than the fact that Snider performed an inspection, as discussed above in Section I.C. (*See* D.E. 53-1 at 3–6.)

45.    "Head knowledge" and/or experience in commercial tires cannot provide the same information about tires as the historical analysis performed by the TireCheck system. (*See* D.E. 53-1 at 3–6.)

48.    Snider protected its confidential information by requiring certain management-level employees—including Chapman—to execute Agreements containing restrictive covenants preventing them from disclosing or misusing such information. (*Id.* at 2; D.E. 1-1 at 2.) The confidential information contained in the TireCheck system was password-protected to prevent unauthorized access. (D.E. 53-1 at 5.) Snider also has several policies instructing its employees to safeguard confidential information contained in its employee handbook. (*Id.* at 10; *see id.* at 45–49.)

49.    Fleet survey reports from TireCheck contain significantly more valuable information than the fact that Snider performed an inspection, as discussed above in Section I.C. (*See* D.E. 53-1 at 3–6.)

53.    Defendants' assertion, that "Chapman did not use these fleet survey reports of Saiia or Lehigh for his work at STM" contradicts Chapman's deposition testimony, in which he stated he did not remember whether he did so. (Chapman Dep. 112:19, *available at* D.E. 50-2 at 30.) Chapman's declaration states on October 8, 2020, after he started his employment with STM, he conducted tire surveys for Saiia and Lehigh Hanson, entered the information into the TireCheck System, and

then arranged for the TireCheck information to be provided to those customers. (D.E. 50-1 at 6.)

54.     The data used to create a Fleet Survey report is not good for only 30 days. (D.E. 53-1 at 4–6.)

55.     Fleet survey reports from TireCheck contain significantly more valuable information than the fact that Snider performed an inspection, as discussed above in Section I.C. (*See* D.E. 53-1 at 3–6.)

56.     Chapman solicited Saiia on behalf of Southern Tire Mart during the term of his non-competition agreement. (D.E. 50-1 at 6; (Chapman Dep. 97:19–98:18, *available at* D.E. 50-2 at 26–27.)

Plaintiff further submits that that following undisputed facts offered by Defendants are not material to any issues raised in their motion for summary judgment: 12, 13, 15, 16, 17, 42, 47, 50, and 51.

## ARGUMENT

I. **Whether Snider Properly Invoked the Non-Competition Agreement Is a Question for Trial.**

Defendants do not argue that the restrictive covenant in the Employee Agreement is unenforceable due to any deficiency in the covenant itself. But unlike many non-competition agreements, Snider must actively invoke the non-competition agreement upon an employee's resignation for it to take effect. Snider also must pay

the former employee their full salary for the period the non-competition provision is

in force, a provision that is not required by law. It provides:

> **6. <u>Covenant Not to Compete/Solicit/Interfere.</u>** Within ten (10) days
> of separation from employment for any reason, the Company shall pro-
> vide written notice to Employee of its decision to invoke the provisions
> of this paragraph. This notice shall include the duration of the re-
> strictions set forth below, not to exceed twelve (12) months. In the event
> that the Company invokes the restrictions set forth under this Para-
> graph, during the term of such restrictions, it shall pay to Employee as
> post-employment severance, paid on regular Company paydays, the
> greater of Employee's last Annual Base Salary or prior calendar year's
> Form W-2 earnings, prorated where appropriate for a partial year pe-
> riod.

(D.E. 1-1 at 2.) Defendants argue that events occurring during Snider's invocation

of the non-competition provision render it unenforceable. The arguments lack sup-

porting legal authority and at best establish the existence of mixed questions of law

and fact that are not appropriate for decision on summary judgment.

## A.   The Seven-Day Delay in Payment of Severance Did Not Invalidate the Agreement for Want of Consideration.

Defendants claim the seven-day delay in paying Mr. Chapman his first sever-

ance check is "want of consideration" invalidating the contract because "the lan-

guage of the contract clearly establishes time is of the essence." (D.E. 50-4 at 18.)

This is an affirmative defense. *Smith v. Combustion Res. Eng'g, Inc.*, 431 So. 2d

1249 (Ala. 1983). As such, Defendants bear the burden of proof on this issue. At

summary judgment, "When the moving party has the burden of proof at trial, that

party must show affirmatively the absence of a genuine issue of material fact: it must

support its motion with credible evidence . . . that would entitle it to a directed ver-

dict if not controverted at trial." *United States v. Four Parcels of Real Prop. in*

*Greene & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (cleaned up).

Defendants do not identify what contractual language makes time of the es-

sence. "It is a general rule in equity that time is not of the essence of a contract.

However, the parties to a contract may make time of its essence by a clear manifes-

tation of their intent to do so in the terms of their agreement." *Bell v. Coots*, 451 So.

2d 268, 269 (Ala. 1984) (citations omitted). The contract does say severance will be

"paid on regular Company paydays." But a contract's inclusion of a date on which

a payment should be made does not establish that time is of the essence. *See Breof*

*BNK Tex., LP v. D.H. Hill Advisors, Inc.*, 370 S.W.3d 58, 64 (Tex. App. 2012) ("Or-

dinarily, time is not of the essence, and a date stated for performance does not mean

time is of the essence.").

Nor do Defendants identify any other reason why time would be of the es-

sence. They assert that Chapman is entitled to "an uninterrupted income stream . . .

in form of timely severance payments if Chapman is to sit at home for nine months

and not work in his chosen profession." (D.E. 50-4 at 18.) But the contract says no

such thing (nor does it require that Chapman "sit at home" and refrain from working

at any job). And this is no different from the ordinary reason why a late payment

might result in some prejudice to the payee: the time value of money. If Chapman

did suffer some nominal damages resulting from the late payment, he could have asserted a counterclaim for breach of contract, as minor breaches may be remedied even if they don't warrant rescission. That Chapman chose not to do so indicates that he suffered no damages and that any breach here was not material.

In any event, "want of consideration," ordinarily a defense to a suit on a promissory note wherein the party who made the note claims they received no consideration, is a complete lack of consideration. *Parker v. McGaha*, 280 So. 2d 769, 773 (Ala. 1973). Defendants do not claim that Chapman received no consideration, only that it was delayed. This argument is legally baseless.

### B.   The Payment of Severance is Not a Condition Precedent to the Enforcement of the Restrictive Covenants

Defendants claim that "Snider's timely payment of severance is a material condition precedent of the contract, and Snider's failure to satisfy it renders the contract invalid." (D.E. 50-4 at 19.)[1] The contention the obligation to pay severance is a condition precedent is straw man. Defendants' argument does not identify any language in the contract connecting the initiation of Chapman's duties not to compete to his receipt of the severance payment.

"A condition precedent is an act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises." *CAM Invs., LLC*

---

[1] Like want of consideration, failure of a condition precedent is an affirmative defense. *Henry James Bar-Be-Que, Inc. v. Gilmore*, 711 S.E.2d 530 (N.C. Ct. App. 2011). Defendants' burden at summary judgment again is to prove the evidence would entitle it to a directed verdict at trial.

*v. Totty*, 128 So. 3d 749, 753 (Ala. Civ. App. 2013) (cleaned up); *accord Mosely v. WAM, Inc.*, 606 S.E.2d 140, 144 (N.C. Ct. App. 2004). "Whether a provision in a contract is a condition precedent depends, not upon formal words, but upon the intent of the parties, to be deduced from the whole instrument." *Middlegate Dev., LLP v. Beede*, 2011 WL 3475474, at *8 (S.D. Ala. 2011). "Because the failure of the occurrence of a condition precedent is an affirmative defense, "Defendants bear "the burden of making a prima facie showing that [they are] entitled to summary judgment based on this defense." *CAM Invs.*, 128 So. 3d at 753 (cleaned up). Defendants do not carry this burden.

The contract does not say payment of severance is a "condition precedent" to Chapman's obligations. The only condition *precedent* is that Snider invoke the restrictions. It did. Payment of severance is required only "[i]n the event the company invokes the restrictions." (D.E. 1-1 at 2.) No language in the contract connects Chapman's receipt of the severance payment to the initiation of his obligations. Chapman's obligation to comply with the restrictions arose when Snider mailed notice of its intent to invoke them, not upon payment of severance. This was before any payment under the contract was due. Where a payment is scheduled to be made after a party's obligation arises, it is not a condition precedent. *Maul v. Eiland*, 3 So. 688, 689 (Ala. 1888).

### C.    Whether Snider's Seven-Day Delay in Initiating Severance Payments Is a Material Breach of the Contract is a Dispute for Trial.

Defendants argue that the restrictive covenants are unenforceable because "Snider's failure to timely pay severance is a material breach that 'goes to the root or essence of the contract.'"[2] (D.E. 50-4 at 20 (citation omitted).) Defendants are correct that Snider's first payment of severance to Mr. Chapman was not made on the first regular payday following his resignation; it was made seven days thereafter. Defendants are wholly incorrect, however, in asserting there is no question of fact whether this delay was a material breach of the contract. In fact, they do not cite a single case holding a seven-day delay in payment is a material breach of a contract.

"Whether a breach is material is ordinarily a question for the trier of fact." *Karl Storz Endoscopy-Am., Inc. v. Integrated Med. Sys., Inc.*, 808 So. 2d 999, 1013 (Ala. 2001). It becomes a question of law only "if in a particular case the question is so clear as to be decided only in one way." *Harrison v. Family Home Builders, LLC*, 84 So. 3d 879, 889 (Ala. Civ. App. 2011) (citation omitted); *accord Blake v. Harris*, 784 S.E.2d 236 (N.C. Ct. App. 2016).

"A material breach of a contract 'is one that touches the fundamental purposes of the contract and defeats the object of the parties in making the contract.'"

---

[2] Prior material breach is also an affirmative defense. *See, e.g.*, *Lin v. Veritex Cmty. Bank,* Civil Action H-20-1904, 2022 WL 510483, at *7 (S.D. Tex. Feb. 21, 2022).

*Bentley Sys., Inc. v. Intergraph Corp.*, 922 So. 2d 61, 93 (Ala. 2005) (citation omitted); *accord Long v. Long*, 588 S.E.2d 1, 4 (N.C. Ct. App. 2003). A material breach occurs only when an injured party has sustained a substantial injury by the breach. *Malladi v. Brown*, 987 F. Supp. 893, 905 (M.D. Ala. 1997). "Substantial performance is the antithesis of material breach. If a breach is material, it follows that substantial performance has not been rendered." *Harrison*, 84 So. 3d at 889 (citation omitted); *accord Wilson v. Wilson*, 134 S.E.2d 240, 243 (N.C. 1964).

Defendants' arguments do not carry their high burden to show that "reasonable minds could not differ" on whether Snider's seven-day late severance payment was a material breach. First, they admit that Chapman ultimately received the payment in question. (D.E. 50-4 at 8–9.) A late payment made under a contract typically does not qualify as a material breach. *See, e.g.*, *Stockton v. CKPD Dev. Co.*, 936 So. 2d 1065, 1078 (Ala. Civ. App. 2006); *Cator v. Cator*, 321 S.E.2d 36, 39 (N.C. Ct. App. 1984). After all, "[s]ubstantial performance of a contract does not contemplate exact performance of every detail but performance of all important parts." *Mac Pon Co. v. Vinsant Painting & Decorating Co.*, 423 So.2d 216, 218 (Ala. 1982). A payee who receives all payments due under a contract with a slight delay does not suffer much, if at all, in the way of damages.

"Rather, to constitute a material breach, the late payment must occur where time is of the essence." *Centurion Air Cargo*, 420 F.3d at 1151. This is an exception

rather than the rule, as "time is not generally of the essence of a contract for the payment of money." *Whitaker v. Bond*, 63 N.C. 290, 292 (N.C. 1869). To overcome the usual presumption, "the language of the original contract" must contain a "clear manifestation of an intent that time should be of its essence." *Isom v. Johnson*, 87 So. 543, 544 (Ala. 1920). As explained above in Section II.A, nothing in the Employment Agreement suggests time is of the essence.

Prior material breach is an affirmative defense on which Defendants have the burden of proof. *See, e.g.*, *Slinski v. Bank of Am., N.A.*, 981 F. Supp. 2d 19, 30 (D.D.C. 2013). Defendants have not carried this burden.

### D.   The Undisputed Evidence Establishes Snider Timely Invoked the Restrictive Covenants.

Defendants argue that Snider failed to timely assert its rights under the Agreement because Chapman did not receive the October 5, 2020 letter invoking the restrictive covenants. (D.E. 50-4 at 21–22.) But Defendants admit two critical facts that sink their argument. First, "Paragraph 6 does not itself contain a notice provision directing how or in what manner Snider can provide written notice to Chapman." (*Id.* at 22.) Second, Paragraph 10 does contain such a notice provision:

> 10. **<u>Notice.</u>** All notices required and permitted to be given under this Agreement shall be in writing and *shall be deemed to have been given when mailed* by certified or registered mail, return receipt requested, addressed to the intended recipient as follows, or at such other address as is provided by either party to the other.

(D.E. 1-1 at 3 (emphasis added); *see* D.E. 50-4 at 22.) Snider satisfied this provision when it mailed the October 5, 2020 letter. Defendants admit that the letter "was post-marked October 7, 2020" and that it "arrived at and departed the USPS regional facility in Birmingham" two days later. (D.E. 50-4 at 7.) The letter itself and its tracking information show that Snider invoked its rights under Paragraph 6 and that it sent the letter as Certified Mail. (*See* D.E. 10-2 at 2, D.E. 17-4 at 1; D.E. 28.)

Defendants assert that "[t]he mailbox rule and notice provision of Paragraph 10 cannot apply to an optional noncompete," which is how they characterize the restrictive covenants in Paragraph 6. (D.E. 50-4 at 22.) This is incorrect. "[I]t is elementary that it is the terms of the written contract . . . that control its interpretation." *Kinmon v. J.P. King Auction Co.*, 276 So. 2d 569, 570 (Ala. 1973). "When the terms of a contract are clear and unambiguous the express terms of the contract control in determining its meaning." *Harris-Teeter Supermarkets, Inc. v. Hampton*, 334 S.E.2d 81, 83 (N.C. Ct. App. 1985). Here, the express terms of the Agreement unambiguously provide that either party's obligation to provide *any* notice under the Agreement is deemed satisfied "when mailed." That language controls here.

Even Defendants' own citation to the Second Restatement of Contracts (which is the only authority they cite to this section of their brief) does not support their argument. While they highlight the general rule that "an acceptance under an option contract is not operative until received by the offeror," that rule is prefaced

21

by the phrase "[u]nless the offer provides otherwise." (D.E. 50-4 at 22 (quoting Re-statement (Second) of Contracts § 63 (1981))); *see also EOG Res., Inc. v. Berwick Res., L.P.*, 2015 WL 11090691, at *6 (D. Mont. 2015) ("While the general rule for options contracts requires actual receipt, receipt is not required if the [contract] itself provided otherwise."). Here, the contract does provide otherwise. Snider satisfied its obligations under the Agreement by mailing the October 5, 2020 letter.

General principles of equity do not require (or even suggest) a different result. (*See* D.E. 50-4 at 23.) Defendants' argument here is based on a hyper-technical read-ing of the Agreement. But "equity looks through form to substance, and an equity court is interested in substantive justice rather than mere technicalities of procedure." *Pittman v. Pittman*, 419 So. 2d 1376, 1378 (Ala. 1982); *accord In re Will of Pender-grass*, 112 S.E.2d 562, 568 (N.C. 1960). As a matter of equity, Chapman *did* receive actual notice of Snider's intent to assert its rights under Paragraph 6 within a month of his resignation.[3] Defendants admit that "[a]t least three weeks after separation, Chapman received a FedEx letter dated October 20, 2020, from Snider's outside counsel." (D.E. 50-4 at 8.) That letter advised Chapman that Snider intended to assert its rights under Paragraph 6 and provided a copy of the Agreement. (D.E. 50-3 at 1.)

---

[3] Chapman also had notice of his own misconduct that clearly violated the restrictive covenants, increasing the likelihood that Snider would be forced to invoke them to protect its rights and busi-ness interests in the face of Chapman's attempted sabotage of its business.

Snider also paid Chapman the severance payments required under Paragraph 6. If anything, equity demands that Chapman be held to the contract.

### E. The Court Has Already Considered and Rejected Defendants' Argument Regarding a Lack of Chapman's Assent to Paragraph 6.

Defendants briefly argue that Chapman never assented to Paragraph 6 because he never "receive[d] and sign[ed] the return receipt card of Snider's written notice to invoke." (D.E. 50-4 at 24.) But Defendants admit that "[t]he Court earlier rejected this argument" in its order denying (in relevant part) their motion to partially dismiss. (*Id.*) Specifically, this Court held that "the signature relevant to whether Mr. Chapman is bound by the terms of the Agreement (including the covenant not to compete) is his signature on the Agreement, not his signature on the return receipt, so this argument fails." (D.E. 31 at 6.) That ruling is now the law of the case and should not be disturbed. *See Arizona v. California*, 460 U.S. 605, 618 (1983).

Because Defendants cannot show it is undisputed that Snider did not properly invoke the restrictive covenants, and because they do not argue the restrictions themselves are invalid, there is, at a minimum, an issue of fact as to whether Chapman breached the Employment Agreement by working for STM.

## II. Defendants Are Not Entitled to Summary Judgment on Snider's Claims for Misappropriation of Trade Secrets.

Snider asserts two claims of misappropriation of trade secrets against both Defendants, one count under Alabama law and one under federal law. (D.E. 1 at 6–

9); *see* 18 U.S.C. §§ 1832, 1836(b)(1); Ala. Code § 8-27-1 et seq. Before Chapman resigned from Snider, he emailed to his personal address TireCheck reports regarding Snider customers. After Chapman resigned from Snider and began working for STM, he accessed Snider's password-protected computer database and then obtained and misused Snider's trade secrets (i.e., its confidential business information concerning Snider's customers and Snider's servicing of customer accounts) on STM's behalf. (D.E. 1 at 7–8.) Defendants do not dispute this. (*See* D.E. 50-4 at 30.) While Chapman claims that he "did not take and do[es] not possess any trade secret of Snider," (D.E. 50-4 at 10 (citing D.E. 50-1 at 6)), Defendants admit Chapman "obtained" the "the fleet survey reports of Saiia or Lehigh . . . after separating from Snider." And courts "will not consider portions of affidavits and declarations containing legal conclusions on summary judgment," *MetLife Life & Annuity Co. of Conn. v. Akpele*, 131 F. Supp. 3d 1322, 1328 (N.D. Ga. 2015).

## A.   The Information Chapman Took Is a Trade Secret Under Alabama Law and Federal Law.

Snider must show that the information it contends is a trade secret meets all the elements of Ala. Code § 8-27-1 and the Defend Trade Secrets Act. The evidence shows the TireCheck reports Mr. Chapman emailed himself meet the definition.

### 1.   TireCheck data is used in a trade or business.

Mack Clark's declaration explains how Snider uses the data in the TireCheck system in conducting Snider's business. (D.E. 53-1 at 3–6.) Defendants do not argue it is not used in a trade or business. Thus, Ala. Code § 8-27-2(1)(a) is satisfied.

### 2. TireCheck data is "included or embodied" in a "compilation" of data.

Defendants assert without analysis that Snider's customer data stored in the TireCheck system does not fall within one the categories listed in Ala. Code § 8-27-2(b). (D.E. 50-4 at 27.) That section requires that a trade secret be "included or embodied in a formula, pattern, *compilation*, *computer software*, drawing, device, method, technique, or process." Ala. Code § 8-27-2(b) (emphasis added). The comment notes: "The term 'computer software' is intended to be construed broadly to include the algorithm, program, documentation and *data*." Ala. Code § 8-27-2, cmt. a(2) (emphasis added). In denying (in relevant part) Defendants' motion to dismiss, this Court stated: "because Snider alleges that Mr. Chapman accessed a database containing information 'compiled . . . through a substantial investment of time, money, and effort,' Doc. 1 ¶ 33, the court can infer that that information is 'included . . . in a compilation,' Ala. Code § 8-27-2(1)." (D.E. 31 at 14.)

Defendants' admissions and Mack Clark's declaration provide the evidence necessary to prove the allegation. Defendants acknowledge the types of data Snider inputs into the TireCheck system. (D.E. 50-4 at 27.) That data, about the customers'

vehicles and their tires, is obtained by Snider employees physically inspecting customer fleets. Obviously, tire tread depths and wear change over time. Thus, each inspection provides a set of data that reflects the conditions at a point in time. As explained in Clark's declaration, gathering the information about each customer's equipment and tires requires a substantial investment of employee time. (D.E. 53-1 at 3–6.) While a physical inspection may reveal an immediate need, it is the data over time that TireCheck analyzes. The information Chapman stole from Snider's TireCheck account constitutes a "compilation" of data about Snider's customers and their business needs. (*Id.*)

Defendants do not argue this data is not a compilation. Instead, they misdirect by discussing the TireCheck software itself. Snider has never asserted that the TireCheck computer program or its code is Snider's trade secret. Rather, the *data* about its customers and the reports about that data generated by TireCheck are the trade secrets. TireCheck is the tool used to analyze the data. But TireCheck is only useful because of the data Snider has input.

### 3.    Snider's data in TireCheck is not publicly known and is not generally known in the trade.

The compilation of information Snider developed about its customers' equipment and their tires' wear and tear contained in TireCheck does not exist anywhere in the world outside of that database. Ala. Code § 8-27-2(1)(c). While a customer's fleet could be inspected today, that inspection would not provide any information

about the state of the inspected tires even a month ago. Neither the public nor STM nor any other Snider competitor knows the state of Snider's customers' tires, how those tires have worn over time, and when that customer will need a tire replaced.

Defendants argue Snider's TireCheck data is either "publicly known" or "generally known in the trade" and therefore not a trade secret. (D.E. 50-4 at 27–28.) They cite three reasons for this: the software vendor has access, Snider sometimes shares some information with its customers, and that anyone could compile the data. (*Id.*) They cite no authority for any of these arguments.

Cases holding information was "publicly available" have involved items such as information compiled and made publicly available by the government. *See, e.g.*, *Pub. Sys., Inc. v. Towry*, 587 So. 2d 969, 972 (Ala. 1991). Suggesting the software vendor's access to the system makes it "publicly available" is ridiculous. Vendors of software assist their customers in the software's use. The vendor is not the public. Likewise, sharing information about a customer with a customer does not make the information shared public. "A party need not keep a trade secret absolutely secret, and the fact that a trade secret may be disclosed to an outsider for some purpose does not vitiate trade secret protection, even if the outsider is a customer." *Connell v. KLN Steel Prods. Ltd.*, No. 04 C 194, 2009 WL 691292, at *15 (N.D. Ill. Mar. 16, 2009).

Finally, the claim the information is "publicly available to anyone who inspects the customer's fleet" is simply false because the information in the database

27

is not compiled on one day and thrown out the next. It is stored and analyzed. (D.E. 53-1 at 4–5.) Inspecting a fleet today would not reveal anything about the historical information contained in the database.

### 4. The data in Snider's TireCheck system cannot be readily derived from publicly available information.

The data in TireCheck cannot be "readily ascertained or derived from publicly available information." Ala. Code §8-27-2(1)(d). There is no public record kept of a company's tire wear or the performance of an individual customer's tire under the conditions in which it is being used. The information in the database about the customers' tires is the product of a physical inspection on a particular date related to particular types of equipment operating under particular conditions, for example, information about the wear rate of a Michelin GR5074010101 tire on a Grader being operated in the Brierfield Quarry outside of Birmingham.

Defendants attempt to overcome this by claiming TireCheck does nothing more than an experienced tire professional does and its analysis is "head knowledge." This is both factually disputed and misses the point. The issue posed by Ala. Code § 8-27-2(1)(d) is explained in the comments: "Paragraph d is intended to disallow from trade secret protection information that is readily available and does not require substantial research investment to obtain." Ala. Code § 8-27-2, cmt. (a)(4). The data in TireCheck requires a substantial investment in man hours to obtain. (D.E. 53-1 at 6.)

If what Defendants claim were true, Chapman had no reason to use the Tire-Check system when he completed the fleet inspections on October 8, 2020. He could have simply verbally reported his findings. But he didn't. He entered the information into the system and took the resulting reports. And Mack Clark's declaration explains how much more TireCheck does than a one-time analysis of a customer's tires on a particular date. (*Id.* at 3–6.)

### 5.   Snider made reasonable efforts to maintain the secrecy of its customer data in the TireCheck system.

Snider made reasonable efforts to maintain the secrecy of the information in the TireCheck database. Ala. Code § 8-27-2(1)(e). First, it required employees like Chapman to execute Agreements restricting them from disclosing Snider's trade secrets and other confidential business information to unauthorized persons. (*See* D.E. 1-1 at 2.) Second, it adopted policies designed to prevent unauthorized disclosure of its trade secrets and confidential information and disseminated those policies to employees in the company's employee handbook. (D.E. 53-1 at 10.) Third, TireCheck was password protected, and only those with authorization and the correct password could access it. (*Id.*) This is sufficient. *See Movie Gallery*, 648 F. Supp. 2d at 1263.

These actions make this case quite different from the sole case cited by Defendants here: *Allied Supply Co. v. Brown*, 585 So. 2d 33, 36 (Ala. 1991). There, "employees had free access to the [confidential customer and vendor] lists." *Id.* at 36. They "were not marked 'confidential'; the lists were taken home by employees;

29

multiple copies of each list existed; and the information on the lists was contained in the receptionist's Rolodex file." *Id.* Because the employer in *Allied Supply* took none of the precautions that Snider took here, it could not show its trade secrets were "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.* (quoting Ala. Code § 8-27-2(1)(e)). Snider took such reasonable efforts and Defendants have not shown otherwise.

> **6.   Snider derives significant economic value from the data in the TireCheck system.**

Mack Clark's declaration explains the myriad of ways Snider derives economic value from the information in the TireCheck system. Ala. Code §8-27-2(1)(f). It is used to plan inventory, project sales, plan service capacity, and to assist customers in their budgeting for tires. (D.E. 53-1 at 3–6.) The tires Snider primarily sells in Birmingham are used on heavy construction equipment. These are not mass manufactured tires that can be found at the local Sam's Club. They are not always available, can require lead times for ordering of up to a year, and a single tire can cost $20,000. Understanding when a customer is likely to need a replacement tire is critical so that Snider can ensure it has the tire available. Without the information in TireCheck, other vendors competing with Snider cannot predict these needs and are unlikely to be able to deliver the tire the customer needs to put their equipment back in use without a significant delay. This is a competitive advantage for Snider.

While Chapman maintains the personal opinion that historical information on fleet data is not useful, he admitted: "I've heard a lot of people disagree with me [on that]." (Chapman Dep. 47:08, *available at* D.E. 50-2 at 14.) And during the Rule 30(b)(6) deposition of STM, Raymond Alley admitted that "a customer [could] use that historical information for budgeting their future needs over the course of the next year." (STM Dep. at 121:13, *available at* D.E. 53-3 at 32.) This testimony shows there is a genuine dispute of material fact as to the economic value of fleet data contained on Snider's TireCheck account.

### 7. The evidence establishing the TireCheck data was a trade secret under Alabama law also establishes it was a trade secret under federal law.

The federal Defend Trade Secrets Act's definition of a trade secret is substantially similar to that of the ATSA. *Parker v. Petrovics*, No. 2:19-CV-00699-RDP, 2020 WL 3972761, at *4 (N.D. Ala. July 14, 2020); *see* 18 U.S.C. § 1839(3). The evidence explained above establishes that the TireCheck data Chapman took is a trade secret under the DTSA because it is "financial, business . . . information," Snider took reasonable steps to keep the information secret, it derives independent economic value from not being known, and it is not "readily ascertainable through proper means." (*See* D.E. 53-1 at 10.)

31

**B.      The Evidence Supports a Reasonable Inference that Chapman
Used the Information He Took from Snider for STM.**

As the non-movant, Snider is entitled to the reasonable inference that Chapman misused and wrongfully disclosed Snider's trade secrets to STM. The related doctrine of inevitable disclosure supports this argument. "Under this theory, 'a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets.'" *Merck & Co. v. Lyon*, 941 F. Supp. 1443, 1457 (M.D.N.C. 1996) (citation omitted). The inference is much stronger here, as Chapman surreptitiously accessed Snider's TireCheck account *after* he had resigned his employment and began working for a direct competitor. And he admitted to calling on the same Snider customers (Lehigh and Saia) that were the subjects of the data he stole from Snider after starting his employment with STM. (Chapman Dep. 98:07, *available at* D.E. 50-2 at 27.) This evidence raises the reasonable inference that Chapman used the stolen data to perform his job duties at STM.

Defendants' assertion that "Chapman did not use the fleet survey reports of Saiia or Lehigh, which he obtained after separating from Snider, for his work at STM" and that "he did not share the reports with others at STM" (D.E. 50-4 at 30), contradicts Chapman's deposition testimony:

> Q.     Have you provided any of these four reports we've attached as
>          Exhibit 1 to anybody at Southern Tire Mart?

A.      I do not recall. I don't think so but I don't recall for sure.

(Chapman Dep. 112:19, 113:06, *available at* D.E. 50-2 at 30.) Chapman cannot pre-

vail at summary judgment by presenting a declaration that contradicts his deposition

without any explanation. *See Merritt v. Hub Int'l Sw. Agency Ltd.*, No. 1:09-CV-

00056-JEC, 2011 WL 4026651, at *3 (N.D. Ga. Sept. 12, 2011).

## III.    <u>The Evidence Establishes an Issue of Fact over Chapman's Breach of the Employment Agreement's Confidentiality Provision.</u>

Snider's claim against Chapman for breach of the confidentiality provisions

of the Employment Agreement alleges that Chapman disclosed Snider's confidential

information to STM. (D.E. 1 at 5; D.E. 1-1 at 2.) An employer may enforce a contract

prohibiting disclosure of confidential information without regard to the infor-

mation's status as a trade secret. *See* Ala. Code § 8-1-191(a)(2). The Employment

Agreement's definition of confidential information comports with Alabama law. *See*

Ala. Code § 8-1-191(a)(2). And the confidentiality provisions of the Employment

Agreement are not dependent on any notice being provided, so Chapman cannot and

does not argue these provisions of the contract are unenforceable. Rather, he claims

either that the information was not confidential or that he did not disclose such in-

formation. The evidence shows otherwise.

Mack Clark's declaration details the information Chapman took before he re-

signed. In addition to the TireCheck reports, from two weeks up to and including

after he turned in his resignation, Chapman emailed to his personal address the following: Off Tire Tracker Reports, sales reports, his Microsoft Exchange contacts, vendor invoices, pricing information, and instructions for generating the Profit and Loss statement for Snider's Birmingham location. These documents are on their face "financial data, sales figures, costs and pricing figures" within the scope of the Agreement and none of this information is known to the public. (D.E. 53-1 at 2, 7.)

Chapman's original duties when he accepted employment with STM were to sell the same types of tires to the same types of customers as he had for Snider and he did so until he received counsel's letter. (Chapman Dep. 97:19–98:18, *available at* D.E. 50-2 at 26–27.) Moreover, Chapman's own declaration states that on October 8, 2020, while an employee of STM, he conducted fleet inspections on the Snider customers Saiia and Lehigh/Hanson and used Snider's TireCheck software to provide them reports of those inspections. (D.E. 50-1 at 6–7.) Snider then lost Lehigh/Hanson business to STM. (Chapman Dep. 113:21–114:05, *available at* D.E. 50-2 at 30–31.)

Chapman also admitted that he provided Snider customer contact information to representatives of STM so that they could solicit those customers. Chapman's own testimony proves this information was confidential.

Q.   While you were working for Snider, had you ever shared any information about any of your customers with Darwin Ellison?

A.   When I was working for Snider?

34

Q.     Yes.

A.     No.

Q.     Why wouldn't you share information about your customers with Mr. Ellison?

A.     We were direct competitors. He had most of the contacts anyway; but, like I say, we were competitors. Why would I give him information?

Q.     So, if Mr. Ellison called you and said "Hey, I don't have the cell phone number for the purchasing manager at Lhoist Brierfield," would you have given it to him?

A.     When I was working for Snider?

Q.     When you were working for Snider.

A.     No.

(Chapman Dep. 101:19–103:08, *available at* D.E. 50-2 at 27–28.) This evidence is more than sufficient to create a genuine dispute of material fact over whether Chapman breached the Employment Agreement's confidentiality provisions.

## CONCLUSION

For the reasons discussed above, the Court should deny Defendants' motion for summary judgment in its entirety.

Date: April 29, 2022.

35